UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

James Chance,

                           Petitioner,                    14CV8928 (CS)(LMS)

             - against -

William Keyser,                                           **REPORT AND
                                                         RECOMMENDATION**

                           Respondent.


TO: THE HONORABLE CATHY SEIBEL, U.S.D.J.[1]

Currently before the Court is a petition for a writ of habeas corpus pursuant to 28 U.S.C.

§ 2254 filed by Petitioner James Chance ("Petitioner"), challenging his judgment of conviction

for the crimes of burglary in the second degree, petit larceny, grand larceny in the fourth degree,

and criminal mischief in the fourth degree, for which he was sentenced to an aggregate term of

imprisonment of 12 years, plus 5 years of post-release supervision. Docket # 1 (the "Petition") ¶¶

2(a)-(b), 3, 5; Docket # 30 ("Aff. in Opp.") at 1. The Petition sets forth three grounds[2] for habeas

relief: (1) the denial of a fair trial and the right to present a meaningful defense as a result of the

---

[1]On December 4, 2014, this matter was referred to the undersigned by the Honorable
Cathy Seibel. Docket # 9.

[2]"Ground Three" on the Petition form is left blank; the three grounds are listed as
"Ground One," "Ground Two," and "Ground Four." See Petition ¶ 12. In addition, the Petition
form filed with the Court is missing pages 11 and 12. It is unclear whether these pages are
missing or whether Petitioner never included them in the document that he filed. These pages
would have included the remainder of Petitioner's response regarding "Ground Four" of his
Petition, i.e., whether the claim (legal sufficiency of the evidence/verdict against the weight of
the evidence) was fully exhausted in the state courts, either by direct appeal or post-conviction
proceedings, as well as the answers to question 13 (whether Petitioner had fully exhausted all the
claims being raised in his Petition and if not, why not) and question 14 (whether Petitioner had
previously filed any type of petition, application, or motion in a federal court regarding the
conviction that is the subject of the instant Petition). The missing pages have had no impact on
the Court's ability to address the claims raised in the Petition.

*No objections to this Report and Recommendation (the "R&R") have been received,
and thus I review it for clear error. I find none, and therefore adopt the R&R as the
decision of the Court. The Clerk of Court is respectfully directed to send a copy of
this endorsement to Petitioner and close the case.*

                                                         SO ORDERED.

                                                         *Cathy Seibel*
                                                         _____
                                                         CATHY SEIBEL, U.S.D.J.

                              4/6/18

delay in charging and arresting Petitioner; (2) ineffective assistance of trial counsel and denial of the right to a fair trial; and (3) insufficiency of the evidence and that the verdict was against the weight of the evidence.  Petition ¶ 12.

For the reasons that follow, I conclude, and respectfully recommend that Your Honor should conclude, that the Petition should be denied in its entirety.

## BACKGROUND

### I.    The Crime

Mina Elraheb lived with his parents at 223 Nepperhan Avenue, Apartment 3N, Yonkers, New York.  See Resp't's Ex. 8 & Transcript of Petitioner's Criminal Trial ("Tr.") at 17.[3]  The apartment, which has three bedrooms, could be accessed through either the front door, which had a dead bolt, or the fire escape door, which was in the rear of the apartment, off of the kitchen, and which had an exterior lock and a chain interior lock.  Tr. 17-20.

On May 29, 2008, Mina left the apartment to go to work around 7:30 a.m.  Tr. 20-21.  At that time, he had in his bedroom an HP Pavillion laptop, a wallet in his dresser with two credit cards that he never used (one from Washington Mutual and one from Capital One), and two to three hundred CDs in his closet.  Tr. 21-22.  When he left for work, his bedroom was neat and organized, and the other rooms in the apartment were orderly.  Tr. 21-22.  Mina's father, Saeed, was also in the apartment at the time, getting ready to go to work; Mina left before him.  Tr. 22.  When Saeed left for work around 7:50 or 7:55 a.m., he locked the doors to the apartment.  Tr. 49-

---

[3]Citations to "Resp't's Ex. __" refer to exhibits submitted to the Court by Respondent that comprise the state court record from Petitioner's criminal case.  See Docket # 21.  The transcript of Petitioner's criminal trial was included as an exhibit to Resp't's Ex. 8, which is the People's opposition to Petitioner's N.Y. Crim. Proc. Law § 440.10 motion.

50.[4] Everything in the apartment was clean and in order. Tr. 50-51.

Mina returned home from work around 5:15 p.m. Tr. 22. When he got home, he entered the apartment through the front door, which was closed but unlocked. Tr. 22-23. Mina thought that maybe his father forgot to lock the front door. Tr. 23. As soon as Mina entered the apartment, he noticed that the bathroom light was on and turned it off. Id. As he entered the living room, he noticed that one of the couch cushions had been overturned. Id. Then he walked into his bedroom and found that it had been totally ransacked. Id. The dresser was open, with drawers all over the bed, and the laptop, which had been on the desk, was missing. Id. Mina got scared and tried to contact his father. Id. When he could not get in touch with his father, he went downstairs and called the police. Id. After calling the police, around 5:30 p.m. Mina called the credit card companies to cancel his cards in order to stop any possible transactions. Tr. 23-24, 40. At Petitioner's trial, Mina testified as to the authenticity of a monthly statement that he had received from Washington Mutual in mid-June, 2008, which included an unauthorized charge of $75 made in the Bronx on the day of the burglary. Tr. 37-41.[5]

---

[4]This included a fire escape door that was in Mr. and Mrs. Elraheb's bedroom, the fire escape door that was in the kitchen, and the main entry door. Tr. 49-50.

[5]The Court does not have a copy of the credit card statement, which was received in evidence at trial as People's Exhibit 51, see Tr. 38, but as to the stolen credit card, the prosecution asserted that the $75 charge was made at an Exxon Mobil gas station in the Bronx located near Petitioner's apartment. See, e.g., Resp't's Ex. 11 (People's Brief on Appeal) at 3 ("After the burglary a charge was made using Mina's stolen Washington Mutual credit card in the amount of $75.00 for gas at an Exxon Mobil in the Bronx (T. 39-42; P.E. 51 [card statement])."); Aff. in Opp. at 11 ("Petitioner lived right off of Bruckner Boulevard, where there were several gas stations around the corner from his house (T. 137). Petitioner was not willing to concede that there was an Exxon gas station in the area of Bronx River Avenue and Bruckner Boulevard (T. 145). Petitioner agreed that he may have paid over $75 to fill up the gas tank of his Chevy Blazer in 2008 (T. 137-38).").

3

The police arrived about fifteen minutes after Mina called them. Tr. 24. After the police arrived, and Mina was looking around his bedroom, he noticed that there was a brown napkin on the floor immediately before the entrance to the adjacent bedroom, which was used as an office. Tr. 25-26. That brown napkin or paper towel was not a type that they had inside the apartment and was not there when Mina left the apartment that day. Tr. 36.[6] Mina also noticed that the chain on the fire escape door in the kitchen, which was accessible from the interior of the apartment, was unlocked. Tr. 26. The chain had been on the door when Mina had left that morning. Tr. 28-29. Mina saw marks on the fire escape door, where white paint around the door handle was chipped away. Tr. 27, 29.[7]

Some of the drawers and cabinets in the kitchen had been opened. Tr. 26, 53-54. The office, which was in between the other two bedrooms, was "messed up," with file cabinets opened and files on the floor; a computer was not working, and the phone system was turned off. Tr. 55. Mr. and Mrs. Elraheb's bedroom had also been ransacked, with drawers on the bed and items on the floor. Tr. 57.

Among the other items that were missing from Mina's room were the carry case for his

---

[6]Throughout the record of the criminal proceedings, including at trial, this item is interchangeably referred to as either a "napkin" or a "paper towel."

[7]On cross-examination, Mina stated that he did not check the fire escape door to see whether it was locked before going to work that day, but it was usually locked. Tr. 42-43. He also conceded that the chip marks on the door could have been there the day before the burglary. Tr. 43. Saeed testified that he knew that the chain lock was on the fire escape door "[a]ll the time" because he always checked all the doors before leaving the apartment. Tr. 48. However, Saeed added on cross-examination that he did not have a specific recollection that all of the doors were securely locked when he left for work on May 29, 2008, but that it was their custom when they left the apartment to make sure that the stove and lights were off and the doors were locked. Tr. 70.

HP Pavillion laptop, over 200 CD's, a backpack, cologne, a computer memory card, and an external hard drive, Tr. 30-33; from the office, the missing items included a Toshiba laptop, Tr. 56; and from Mr. and Mrs. Elraheb's bedroom, the missing items included Mrs. Elraheb's gold jewelry, Tr. 59, a woman's Seiko watch, Tr. 61, a Sony digital camera, Tr. 61-62, and a man's Kenneth Cole watch, Tr. 65. When he returned to the apartment that evening, Saeed also noticed the brown paper towel or napkin on the floor because they did not use that type of napkin in their house, and it was not there when he left the apartment that morning. Tr. 66.

On the evening of the burglary, Elizabeth Wagner, then a member of the Yonkers Police Department Criminal Identification Unit, or crime scene unit, went to the apartment. Tr. 71-73. Ms. Wagner took photographs of the crime scene. Tr. 74. She also collected swab samples from the doorknob on the interior kitchen door, Tr. 75-76, the handles of drawers from the dresser in Mina's bedroom, Tr. 76, and the handles of the doors on the cabinets and the desk drawer handles in the office, Tr. 78-79. Ms. Wagner collected the brown paper towel or napkin from the floor of Mina's bedroom. Tr. 77. She gathered latent fingerprints that she found on one of the storage cabinets in the office, although this did not end up yielding a usable fingerprint. Tr. 79-81. Ms. Wagner collected two boxes that were on the bed in the master bedroom to see if latent fingerprints could be gathered from their surfaces back in the Yonkers forensic lab using a chemical process. Tr. 82. When tested in the lab on June 24, 2008, no usable fingerprints were discovered on either of the boxes. Tr. 82-83.

On June 5, 2008, Ms. Wagner transported the eight swabs as well as the brown paper towel that she had collected from the crime scene to the Westchester County Department of Laboratories and Research for the purposes of DNA analysis. Tr. 85, 104-05. Joselyn

Chernjawski, a forensic scientist who worked in the forensic biology section of the Westchester County Department of Laboratories and Research, tested five of the swabs for possible DNA analysis. Tr. 106. No DNA was detected on two of the swabs, and on the three other swabs, very little DNA was present, so no DNA profiles could be generated from them. Id. Consequently, Ms. Chernjawski proceeded to test the paper towel. Id. She first tested the paper towel for biological staining from blood, semen, saliva, or nasal secretions, but no suspicious staining was noted. Tr. 108. Then, she cut out about a 25 percent portion of the center of the paper towel to test for epithelial, or surface, cells in order to possibly get some DNA. Tr. 109, 119. She placed the remainder of the paper towel in its original packaging and sealed that up to have it returned to the police department. Tr. 109, 120. She then proceeded to test the cut out piece of paper towel for DNA. Tr. 109-10. A DNA profile was obtained from this piece of paper towel and was put in a data bank for stored DNA profiles on July 7, 2008. Tr. 110. On August 4, 2008, the lab was notified of a match and in turn, the Yonkers Police Department was notified as well. Tr. 110-11; see Resp't's Ex. 1.

On March 24, 2009, Police Officer Raymond Dugan from the Yonkers Police Department arrested Petitioner. Tr. 88.

On December 8, 2009, Senior Investigator Edward J. Murphy from the Westchester County District Attorney's Office took DNA buccal swabs from Petitioner and turned them over to the Westchester County Department of Laboratories and Research for analysis. Tr. 90-92.[8] That same day, Ms. Chernjawski, the forensic scientist who had originally analyzed the paper towel, tested and compared the DNA from the known buccal swab that had just been received

_____

[8]These DNA buccal swabs were obtained pursuant to a court order. See Resp't's Ex. 6.

with the DNA profile from the piece of paper towel. Tr. 111-12. Both the buccal swab and the paper towel presented only a single source, not a mixture, of DNA. Tr. 123-24. Based on her comparison of the two samples, Ms. Chernjawski testified that the chances of finding the DNA profile found on the paper towel in someone other than Petitioner in the general population was about one in four hundred ten trillion individuals. Tr. 116. She noted, however, that she did not perform any tests on the other 75 percent of the paper towel and did not know whether anyone else's DNA was on that portion of the paper towel. Tr. 120. She also could not say when the DNA that she found on the paper towel was deposited there, the circumstances under which it was deposited there, or how old the DNA was. Tr. 121-22. Ms. Chernjawski testified that she could not say from her DNA analysis who brought the paper towel into the apartment or whether Petitioner himself was ever in the apartment. Tr. 122. She stated that to her knowledge, Petitioner's DNA was not found anywhere else in the apartment. Tr. 122-23.

Petitioner took the stand at trial and testified in his own defense. Petitioner testified that he lived at 941 Hoe Avenue, Apartment 3, Bronx, New York. Tr. 125.[9] He stated that he was married and had three children. Id. Petitioner said that he was employed as a front desk attendant at both the Center for Urban Community Services and the Neighborhood Coalition Shelter until about February or March, 2008. Tr. 126. He explained that because both of those places catered to substance abuse clients, he relapsed into drinking and using drugs and at that time took a voluntary leave of absence from those jobs. Tr. 127, 138. Petitioner stated that

_____

[9]Upon arrest, Petitioner likewise stated that his address was 941 Hoe Avenue in the Bronx. Tr. 89. Petitioner testified that he lived right off of Bruckner Boulevard and admitted that there were gas stations on Bruckner Boulevard right around the corner from where he lived, but he denied that there was an Exxon Mobil right around the corner. Tr. 137. He testified that in 2008 it cost $75, possibly more, to fill up the gas tank of his Chevy Blazer truck. Tr. 138.

during the time that he was in relapse, his wife was employed as a receptionist for Project Samaritan and Company, an organization that catered to people with AIDS and substance abuse histories. Tr. 127.

Petitioner stated that from February to July, 2008, he sold knock-off sneakers and bootleg DVDs at hair salons, barber shops, and local parks from his Chevy Blazer truck. Tr. 128-29. On days when he was not selling sneakers, about two or three times a week, he would rent out his truck to other addicts and drug dealers in exchange for money and drugs. Tr. 130, 144. Petitioner admitted to having brown paper towels like the piece found at the crime scene in his truck. Tr. 131. Petitioner said that he had the paper towels in his truck because he was a "heavy sweater." Tr. 131, 142. Petitioner explained that he had a lot of white sneakers, and if someone came to look at sneakers and their hands looked sweaty or dirty, he would give them the paper towel so that they could wipe their hands off, so that they did not make dirty fingerprints on the white sneakers. Tr. 132, 142-43. Also, Petitioner would put paper towel inside the sneakers so that women who were not wearing socks could try on the sneakers without getting the insoles sweaty or dirty. Tr. 132, 143. Petitioner said he kept paper towels in the back of the truck, where the sneakers were, as well as in the front, where he sat, and he left them in the truck when he rented it out. Tr. 132-33. Petitioner testified that he used the paper towels himself to wipe his hands off when he was sweaty or when he was eating in the vehicle, and he would usually "just put it down" when he was done using them. Tr. 133. Petitioner admitted that his DNA was on the piece of paper towel that was tested, but testified that he did not know how a paper towel with his DNA on it wound up in the apartment in Yonkers and denied entering the apartment or even being in Yonkers on that date. Tr. 133-34, 147.

8

## II.   **Procedural History**

On March 19, 2010, at the conclusion of a bench trial, Petitioner was found guilty of burglary in the second degree, petit larceny, grand larceny in the fourth degree, and criminal mischief in the fourth degree. Tr. 160-61; Petition ¶¶ 2(a), 5.  On May 11, 2010, Petitioner was sentenced to an aggregate term of imprisonment of 12 years, plus 5 years of post-release supervision.  Docket # 35 (Sentencing Transcript) at 10; Petition ¶¶ 2(b), 3, 5; Aff. in Opp. at 1.[10]

On September 11, 2011, Petitioner, proceeding pro se, filed a N.Y. Crim. Proc. Law § 440.10 motion. Resp't's Ex. 7.  Petitioner raised four claims in his motion: (1) Petitioner was denied due process when he was denied his right to have a felony hearing, receive a grand jury notice, and appear as a witness before the grand jury; (2) the evidence of burglary in the second degree was legally insufficient (based on the DNA evidence); (3) the evidence of burglary in the second degree was legally insufficient (based on the evidence related to the possession and use of the stolen credit card); and (4) ineffective assistance of counsel (based on counsel's failure to conduct pre-trial investigation, file pre-trial motions, request Brady or Rosario material, or pursue a reasonable trial strategy).  Id.  On February 10, 2012, the County Court denied Petitioner's § 440.10 motion.  Resp't's Ex. 9.  On October 3, 2012, the Appellate Division, Second Department denied Petitioner's application for leave to appeal the denial of his § 440.10 motion.  Resp't's Ex. 15.

Meanwhile, in February, 2012, Petitioner, proceeding through counsel, directly appealed his judgment of conviction.  Resp't's Ex. 10.  Petitioner raised three arguments on appeal: (1) the

---

[10]Although the Petition, the Affidavit in Opposition, and all of the state court post-trial decisions state that Petitioner was sentenced on May 4, 2010, the sentencing transcript that has been provided to the Court is dated May 11, 2010.  See Docket # 35.

9

prosecution's undue delay in arresting him denied him a fair trial and the right to assert a

meaningful defense; (2) ineffective assistance of counsel, leading to the denial of the right to a

fair trial and the opportunity to present a meaningful defense (based on the failure to fully

investigate and to take steps to have the entire paper towel DNA tested and to obtain information

and video from the gas station where the stolen credit card was used); and (3) the verdict was not

supported by legally sufficient evidence and was against the weight of the evidence. Id. The

Appellate Division, Second Department affirmed the conviction on April 3, 2013. People v.

Chance, 105 A.D.3d 758 (2d Dep't 2013). Petitioner thereafter filed an application for leave to

appeal to the New York Court of Appeals. Resp't's Ex. 16. The New York Court of Appeals

denied leave to appeal on August 28, 2013. People v. Chance, 21 N.Y.3d 1041 (2013).

Pursuant to the prison mailbox rule, Petitioner filed the instant Petition on October 31,

2014. See Docket # 25 at 2 n.2. Following the denial of both Petitioner's application and

renewed application for a stay and abeyance of this proceeding, Docket ## 16, 25, Respondent

filed his opposition papers, Docket ## 30-31. Although given an opportunity to do so, see

Docket # 32, Petitioner did not file any papers in reply.

## DISCUSSION

## I.    Standard of Review

"Habeas review is an extraordinary remedy." Bousley v. United States, 523 U.S. 614, 621

(1998) (citing Reed v. Farley, 512 U.S. 339, 354 (1994)). To be granted a writ of habeas corpus

from a federal district court, a petitioner must fully and carefully comply with the provisions of

the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C. § 2254.

Before a federal district court may review the merits of a state criminal judgment in a

habeas corpus action, the court must first determine whether the petitioner has complied with the procedural requirements set forth in 28 U.S.C. §§ 2244 and 2254. If a petitioner has met these threshold requirements, a federal district court generally may hear "an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court" only if the petitioner "is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The court must then determine the appropriate standard of review applicable to the petitioner's claim(s) in accordance with 28 U.S.C. § 2254(d).

Under AEDPA, all state remedies must be exhausted before a federal court may consider a state prisoner's petition for a writ of habeas corpus. 28 U.S.C. § 2254(b)(1)(A); see also Picard v. Connor, 404 U.S. 270, 275 (1971). In the interests of comity and expeditious federal review, "[s]tates should have the first opportunity to address and correct alleged violations of [a] state prisoner's federal rights." See Coleman v. Thompson, 501 U.S. 722, 731 (1991); see also Daye v. Attorney Gen. of the State of New York, 696 F.2d 186, 190-91 (2d Cir. 1982). The exhaustion requirement of the federal habeas corpus statute is set forth in 28 U.S.C. § 2254(b)(1), (c):

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that–
>> (A) the applicant has exhausted the remedies available in the courts of the State; or
>> (B) (I) there is an absence of available State corrective process; or
>>> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant. . . .
> (c) An applicant shall not be deemed to have exhausted the remedies available in the courts of the State, within the meaning of this section, if he [or she] has the right under the law of the State to raise, by any available procedure, the question presented.

28 U.S.C. § 2254(b)(1), (c).

The Second Circuit has adopted a two-stage inquiry to determine whether the exhaustion doctrine has been satisfied. See Klein v. Harris, 667 F.2d 274, 282 (2d Cir. 1981). First, the petitioner must have "fairly presented" his or her federal constitutional claim to the appropriate state courts. Picard, 404 U.S. at 275-76. "A claim has been 'fairly presented' if the state courts are apprised of 'both the factual and the legal premises of the claim [the petitioner] asserts in federal court.' " Jones v. Vacco, 126 F.3d 408, 413 (2d Cir. 1997) (quoting Daye, 696 F.2d at 191). In other words, the claim must have been presented in a way that is "likely to alert the court to [its] federal nature." Daye, 696 F.2d at 192. The fair presentation requirement is satisfied if the state court brief contains phrases, such as "under the Due Process Clause" or "under the Constitution," that point to the petitioner's reliance on the United States Constitution as his or her legal basis for relief. Klein, 667 F.2d at 282 (internal citations omitted). A claim may be considered "fairly presented" even if the federal grounds were not explicitly asserted before the state courts if the petitioner, in asserting his or her claim before the state court, did one of the following: (1) relied on pertinent federal cases that employ constitutional analysis, (2) relied on pertinent state cases that apply constitutional analysis in like fact situations, (3) asserted his or her claim in terms so particular as to call to mind specific constitutionally-protected rights; or (4) alleged a fact pattern that falls within the mainstream of constitutional litigation. See Daye, 696 F.2d at 194; Irving v. Reid, 624 F. Supp. 787, 789 (S.D.N.Y. 1985). A claim that has not been "fairly presented" in state court is procedurally defaulted and is precluded from federal habeas review, unless the petitioner can show cause for the default, and prejudice resulting from the alleged violation of federal law, or that a fundamental miscarriage of justice will occur if the claim is not considered. Coleman, 501 U.S. at 750; Galdamez v. Keane, 394 F.3d 68, 73-74 (2d

Cir. 2005).

Second, having fairly presented his or her federal constitutional claim to the appropriate state court and having been denied relief, the petitioner must appeal his or her conviction to the highest state court. Klein, 667 F.2d at 282. Where a petitioner fails to present his or her federal constitutional claim to the highest state court, the claim cannot be considered exhausted. Id. (citing Williams v. Greco, 442 F. Supp. 831, 833 (S.D.N.Y. 1977)). There is, however, another avenue available for exhaustion purposes. A petitioner who has failed to exhaust state remedies by pursuing a direct appeal may satisfy the exhaustion requirement by utilizing available state methods for collaterally attacking his or her state conviction. See id.; see also Johnson v. Metz, 609 F.2d 1052, 1055-56 (2d Cir. 1979) (instructing habeas petitioner who did not fairly present claim in the course of his direct appeals in New York state courts to proceed by filing a motion to vacate judgment pursuant to N.Y. Crim. Proc. Law § 440.10). If collateral relief is denied, the petitioner may satisfy the exhaustion requirement by employing the state appellate procedures available for review of such denial. Klein, 667 F.2d at 282-83. A petitioner "need not have invoked every possible avenue of state court review." Galdamez, 394 F.3d at 73. Instead, a petitioner must give the state courts "one full opportunity" to resolve any constitutional issues by invoking one complete round of the State's established appellate review process. O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999). A habeas petitioner who fails to meet a state's requirements to exhaust a claim will be barred from asserting that claim in federal court unless he or she can demonstrate cause and prejudice or a fundamental miscarriage of justice. Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

"For exhaustion purposes, a federal habeas court need not require that a federal claim be

13

presented to a state court if it is clear that the state court would hold the claim procedurally barred." Reyes v. Keane, 118 F.3d 136, 139 (2d Cir. 1997) (quotation marks and citations omitted).  "In such a case, a petitioner no longer has 'remedies available in the courts of the State' within the meaning of 28 U.S.C. § 2254(b)." Grey v. Hoke, 933 F.2d 117, 120 (2d Cir. 1991). The federal habeas court may then "deem the claims to be exhausted, rather than requiring the petitioner to go through the futile process of seeking further state review." Kalu v. New York, 08 Civ. 4984 (NGG)(RLM), 2009 WL 7063100, at *7 (E.D.N.Y. Sept. 15, 2009)[11] report and recommendation adopted sub nom., Ndukwe v. New York, 08 Civ. 4984 (NGG), 2010 WL 4386680 (E.D.N.Y. Oct. 28, 2010); see also Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001); Bossett v. Walker, 41 F.3d 825, 828 (2d Cir. 1994).  However, unless a petitioner "can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law, or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice," Coleman, 501 U.S. at 750, the petitioner's claim will remain unreviewable by a federal court.  See Aparicio, 269 F.3d at 90; Grey, 933 F.2d at 120.

Even where a timely and exhausted habeas claim is raised, comity and federalism demand that a federal court abstain from its review when the last-reasoned state court opinion to address the claim relied upon an "adequate and independent finding of a procedural default" to deny it. Harris v. Reed , 489 U.S. 255, 262 (1989); see also Coleman, 501 U.S. at 730; Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991); Levine v. Comm'r of Corr. Servs., 44 F.3d 121, 126 (2d Cir. 1995).  A state court decision will be "independent" when it "fairly appears" to rest primarily

---

[11]In the spirit of Local Civil Rule 7.2, copies of the unpublished opinions cited herein are included with the copy of this Report and Recommendation being sent to Petitioner.

on state law. Jimenez v. Walker, 458 F.3d 130, 138 (2d Cir. 2006) (citing Coleman, 501 U.S. at

740). A decision will be "adequate" if it is " 'firmly established and regularly followed' by the

state in question." Garcia v. Lewis, 188 F.3d 71, 77 (2d Cir. 1999) (quoting Ford v. Georgia, 498

U.S. 411, 423-24 (1991)).

Provided a claim meets all procedural requirements, the federal court must apply

AEDPA's deferential standard of review when a state court has decided a claim on the merits.

See Torres v. Berbary, 340 F.3d 63, 68 (2d Cir. 2003). Under AEDPA,

> [a]n application for a writ of habeas corpus on behalf of a person in
> custody pursuant to the judgment of a State court shall not be granted with
> respect to any claim that was adjudicated on the merits in State court
> proceedings unless the adjudication of the claim—
>   (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as determined
> by the Supreme Court of the United States; or
>   (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent "if 'the

state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

of law or if the state court decides a case differently than [the Supreme] Court has on a set of

materially indistinguishable facts.' " Torres, 340 F.3d at 68 (quoting Williams v. Taylor, 529

U.S. 362, 412-13 (2000)).

"[A]n unreasonable application of clearly established Supreme Court precedent occurs

when a state court identifies the correct governing legal principle from the Supreme Court's

decisions but unreasonably applies that principle to the facts of the prisoner's case." Torres, 340

F.3d at 68 (internal quotation marks and citation omitted).  While

> it is clear that the question is whether the state court's application of
> clearly established federal law was objectively unreasonable, the precise
> method for distinguishing objectively unreasonable decisions from merely
> erroneous ones is less clear.  However, it is well-established in [the
> Second Circuit] that the objectively unreasonable standard of § 2254(d)(1)
> means that petitioner must identify some increment of incorrectness
> beyond error in order to obtain habeas relief.

Id. at 68-69 (internal quotation marks and citations omitted).

Under the second prong of § 2254(d), the factual findings of state courts are presumed to be correct.  Nelson v. Walker, 121 F.3d 828, 833 (2d Cir. 1997).  The petitioner must rebut this presumption by "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

## II.    Petitioner's Claims for Habeas Relief

### A.    Delay in Charge and Arrest/Speedy Trial

Petitioner claims that the eight-month delay in charging and arresting him resulted in the denial of a fair trial and his right to present a meaningful defense.  Petition ¶ 12 (Ground One).  The time-line of events leading up to Petitioner's arrest was as follows:  the crime occurred on May 29, 2008; on August 4, 2008, it was discovered that the DNA found on the paper towel recovered from the burglarized apartment matched Petitioner's DNA; on November 7, 2008, a Yonkers police detective found out that Petitioner had been arrested in the Bronx on July 31, 2008, on first degree robbery and first degree menacing charges, and was being held at Rikers Island prison; on March 12, 2009, a felony complaint charging Petitioner with burglary in the second degree was filed in City Court, City of Yonkers, and an arrest warrant was issued; and on March 24, 2009, Petitioner was arrested at Rikers Island prison and produced in Yonkers City Court.  Aff. in Opp. at 3-4.

16

In his omnibus motion filed in state court, Petitioner sought to dismiss the indictment based on the eight-month pre-indictment delay, claiming that it violated his due process rights and that he suffered actual prejudice from the delay because he was unable to reconstruct his whereabouts on the day of the crime, thus denying him an alibi defense. See Resp't's Ex. 1 (Affirmation in Support of Omnibus Motion at 3). In denying this part of Petitioner's omnibus motion, the County Court judge declared,

> This stated time period is [sic] does not rise to the level of an unjustified delay in prosecution resulting in the denial of due process. Furthermore, defendant knew his whereabouts from July 31, 2008 until his arrest on these charges since he was in custody. Thus, he has a relatively short period of time (32 days prior to his arrest on the robbery and menacing charges) to reconstruct where he thinks he was on May 29, 2008.

Resp't's Ex. 3 at 3.

On direct appeal, Petitioner once again argued that the eight-month delay between discovery of the DNA match and his arrest impaired his ability to present a meaningful defense because he was unable to recall where he was on the day of the burglary and thus was precluded from presenting alibi evidence. Resp't's Ex. 10 at 19-20. The Appellate Division, Second Department, treating this as a claim for violation of the constitutional right to a speedy trial, applied the five factors originally set forth in People v. Taranovich, 37 N.Y.2d 442, 445 (1975), for determining whether there has been an undue delay: "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the

defense has been impaired by reason of the delay." <u>Chance</u>, 105 A.D.3d at 758 (internal

quotation marks and citations omitted).[12]  In rejecting the claim, the Appellate Division stated,

> Although the approximately eight-month delay between the discovery of
> evidence linking the defendant to the crime and his arrest was to some
> extent unnecessary, given the severity of the underlying offense, the fact
> that the defendant was not incarcerated on the instant charges, and the lack
> of any prejudice, the defendant was not deprived of due process (<u>see</u>
> <u>People v Santos</u>, 303 AD2d 695 [2003]).  Accordingly, the County Court
> properly denied that branch of the defendant's omnibus motion which was
> to dismiss the indictment based on preindictment delay.

<u>Id.</u> at 759.

To begin, to the extent that Petitioner's habeas claim is based on the right to a speedy trial

under the Sixth Amendment, "[i]t is indisputable that the Sixth Amendment speedy trial right

does not apply to pre-indictment delay." <u>United States v. Elsbery</u>, 602 F.2d 1054, 1058 (2d Cir.

1979) (citing <u>United States v. Marion</u>, 404 U.S. 307 (1971)).  Rather, " 'it is either a formal

indictment or information or else the actual restraints imposed by arrest and holding to answer a

criminal charge that engage the particular protections of the speedy trial provision of the Sixth

Amendment.' " <u>Id.</u> at 1059 (quoting <u>Marion</u>, 404 U.S. at 320).  Accordingly, Petitioner does not

have a cognizable claim for habeas relief based on the violation of his Sixth Amendment speedy

trial right.

Claims based upon pre-indictment delay rest instead upon the Due Process Clause, <u>id.</u>

(citations omitted), and a defendant "must carry a heavy burden to sustain a claim of violation of

due process." <u>Id.</u>  "[P]re-indictment delay transgresses due process limits only when there is a

showing of actual prejudice to the defendant's right to a fair trial <u>and</u> unjustifiable Government

---

[12]New York state courts apply these factors to both post-indictment speedy trial claims
and pre-indictment due process claims.  <u>People v. Decker</u>, 13 N.Y.3d 12, 15 (2009).

conduct." Id. (emphasis added) (citations omitted).[13] The dimming of witnesses' memories "has not been considered the sort of actual substantial prejudice that predicates reversal for pre-indictment delay." Id. (citations omitted).

Here, the County Court judge rejected Petitioner's assertion of actual prejudice based on his inability to reconstruct his whereabouts on the day of the crime and found that the eight-month delay was not unjustified; the Appellate Division upheld that decision. Petitioner has failed to show that the state courts' rejection of this claim was either contrary to, or an unreasonable application of, clearly established federal law. Indeed, Petitioner's assertion that he was unable to reconstruct his whereabouts on the day of the crime because of the eight-month delay—essentially a claim of dimmed memory—does not establish actual prejudice, which alone is fatal to this claim. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied.

---

[13]With respect to the kind of government conduct that would need to be shown in order to support a due process claim based upon pre-indictment delay, it has been noted that "[t]here is some disagreement among the district courts in this Circuit as to whether reckless—as opposed to intentional—disregard of circumstances that would likely impede a defendant's ability to mount a defense may support a due process challenge based on pre-indictment delay." United States v. Wey, 15-cr-611 (AJN), 2017 WL 237651, at *13 n. 8 (S.D.N.Y. Jan. 18, 2017) (citing cases). The district judge in Wey further noted, "Recognizing, as have other district courts, that the Court of Appeals appears to have used several different formulations to describe (in general terms) what sort of conduct would cause prejudicial pre-indictment delay to violate the Due Process clause, this Court reads the pertinent decisions to, on balance, more plainly comport with a standard that requires a showing of intentionality." Id. (internal quotation marks and citations omitted). Although the Wey court agreed that the Second Circuit "has never squarely addressed the question of whether recklessness may suffice under certain circumstances and, accordingly, has not foreclosed that possibility," id. (citations omitted), it declined to decide this issue because having found that the defendant "has not articulated actual and substantial prejudice, [the district court] need not address the Government's state of mind or purpose in delaying the filing of the charges at issue." Id. Here, too, the Court need not determine this issue because, as explained, infra, Petitioner has failed to show that he was actually prejudiced by the pre-indictment delay.

**B.**     **Ineffective Assistance of Trial Counsel**

Petitioner claims that trial counsel was ineffective for failing to procure DNA testing of the entire piece of paper towel found at the crime scene.  Only 25% of the paper towel was tested for DNA evidence, from which only Petitioner's DNA was recovered, and Petitioner contends that his trial counsel was ineffective for failing to obtain a court order to have the remaining 75% of the paper towel DNA tested, since it would have established that another person's DNA was on the paper towel as well.  See Petition ¶ 12 (Ground Two); Resp't's Ex. 10 (Petitioner's appellate brief) at 22-25.  Petitioner raised this claim on direct appeal, but the Appellate Division, Second Department declined to address the claim, stating, "The defendant's contention that he was deprived of the effective assistance of counsel is based on matter dehors the record, and cannot be reviewed on direct appeal."  Chance, 105 A.D.3d at 759 (citations omitted).  Although Petitioner asserted a claim of ineffective assistance of counsel in his § 440.10 motion, this particular claimed omission of his trial counsel was not specified in that motion.  See Resp't's Ex. 7 at 20-25.  Thus, for purposes of habeas review, this claim remains unexhausted.  Nonetheless, because under 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State," the Court shall address the merits of this claim.

In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate both (1) that counsel's performance was "deficient" in that it fell below an "objective standard of reasonableness," and (2) that "the deficient performance prejudiced the defense," i.e., a "reasonable probability" exists that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland v. Washington, 466 U.S. 668, 687-88, 694

(1984). However, "there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one." Id. at 697. With respect to the performance component of the inquiry, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. With respect to the prejudice component of the inquiry, the defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. at 687.

The only claimed ineffectiveness of trial counsel relates to the DNA testing of the paper towel found at the crime scene. Although Petitioner contends that his trial counsel was ineffective for failing to obtain a court order to have the remaining 75% of the paper towel DNA tested, Petitioner has failed to establish that this conduct was objectively unreasonable. As pointed out by Respondent,

> Even if the brown paper towel had been tested as petitioner proposed, it would not have exculpated him but at best, may have inculpated others. Petitioner's counsel cross-examined the prosecutor's DNA expert as to the possibility of someone else touching the brown paper towel on the untested portion, and leaving skin cells behind. Ultimately, the witness conceded this was possible. By strategically not having the balance of the towel tested, it allowed for this line of questioning.

21

Resp't's Mem. of Law (Docket # 31) at 18 (citing Harrington v. Richter, 562 U.S. 86 (2011)).[14]

Moreover, Petitioner has failed to establish that he was prejudiced by his trial counsel's failure to procure this additional DNA testing. Petitioner admitted at trial that he possessed and used the kind of paper towel found at the crime scene and that it was his DNA on the piece of paper towel discovered in the apartment. The forensic scientist testified that the DNA that she found on the paper towel came from only a single source, i.e., Petitioner. It is purely speculative whether any other DNA would have been found on the remainder of the paper towel and if so, whether it would have altered the outcome of the trial.[15] Petitioner's claim of ineffective assistance of counsel is thus not a basis for habeas relief. Accordingly, I conclude, and respectfully recommend that Your Honor should conclude, that this claim should be denied. [16]

-------------------

[14]In Harrington, the defendant filed a habeas corpus petition in which he argued that his trial counsel was ineffective for failing to present blood evidence expert testimony, and the Ninth Circuit Court of Appeals agreed and granted the petition. In reversing the Ninth Circuit's decision, the Supreme Court stated, "Even if it had been apparent that expert blood testimony could support Richter's defense, it would be reasonable to conclude that a competent attorney might elect not to use it. . . . An attorney need not pursue an investigation that would be fruitless, much less one that might be harmful to the defense." Harrington, 562 U.S. at 108 (citing Strickland, 466 U.S. at 691). The Supreme Court later noted, "To support a defense argument that the prosecution has not proved its case it sometimes is better to try to cast pervasive suspicion of doubt than to strive to prove a certainty that exonerates." Id. at 109. Thus, Petitioner's trial counsel's decision to forego seeking DNA testing of the remainder of the paper towel and to try instead to raise reasonable doubt concerning the DNA evidence through cross-examination of the forensic scientist, as noted by Respondent, was not an objectively unreasonable strategy.

[15]There was also other evidence linking Petitioner to the crime, including evidence that one of the credit cards stolen from the apartment was used at a gas station near where Petitioner lived in the Bronx, and the dollar amount of the charge was consistent with the dollar amount that Petitioner testified it cost to fill the gas tank of his truck.

[16]The Court noted in its Order denying Petitioner's renewed application for a stay and abeyance of this proceeding, "To the extent that Ground Two of the Petition is derived from Petitioner's claim of ineffective assistance of trial counsel as raised on direct appeal, that claim

was also based on trial counsel's failure to 'apply to the court for investigative services for the purpose of obtaining a video tape from the gas station where the [stolen credit] card was used.' Respondent's Ex. 10 at 26." Docket # 25 at 15 n.13. Petitioner does not mention this aspect of his claim in the Petition itself, and as previously noted, the Second Department did not review Petitioner's ineffective assistance of counsel claim at all on direct appeal because it was "based on matter dehors the record." Chance, 105 A.D.3d at 759. Nonetheless, in his § 440.10 motion, Petitioner did raise an ineffective assistance of counsel claim in which he argued, among other things, that counsel failed to "investigate the use of the credit card (at a gas station) in the Bronx, to see if any video tape existed showing who may have used said stolen credit card." Resp't's Ex. 7 at 23-24.  In denying the § 440.10 motion, the County Court judge stated,

> Defendant has failed to meet his burden in establishing that his counsel was ineffective.  As to his claim that his counsel failed to investigate the case to discover any 'exculpatory' witnesses or evidence, defendant does not set forth what allegedly exculpatory evidence counsel was expected to uncover, other than his speculative assertion that "it stands to reason" that there should be video surveillance from the gas station which may reveal the person who used the stolen credit card.  Aside from this assertion being entirely speculative, the Court notes that such evidence would not effect [sic] the most serious charge against defendant, burglary in the second degree, nor the strongest piece of evidence against defendant, which is that his DNA was found on a napkin in the burglarized apartment from which the credit card was taken.

Resp't's Ex. 9 at 4-5.  Petitioner sought leave to appeal the denial of his § 440.10 motion, making particular mention of his ineffective assistance of counsel claim in the leave application, and leave was denied by the Appellate Division, Second Department. Resp't's Exs. 13-15.  Thus, Petitioner fully exhausted this aspect of his ineffective assistance of counsel claim.  See Pagan v. Lavalley, 13-CV-05324 (PKC)(SN), 2017 WL 1331294, at *7 (S.D.N.Y. Jan. 18, 2017) ("Claims raised in a CPL § 440.10 motion are fully exhausted for purposes of 28 U.S.C. § 2254 where a party has sought leave to appeal the denial of the specific claim from the appropriate Appellate Division.") (citations omitted) report and recommendation adopted by, 2017 WL 1378255 (S.D.N.Y. Apr. 11, 2017).

The Court therefore reviews this claim pursuant to 28 U.S.C. § 2254(d)(1)—whether the state court denial of this claim is contrary to, or an unreasonable application of, clearly established federal law, i.e., Strickland's two-prong test for ineffective assistance of counsel. When evaluating an ineffective assistance of counsel claim in a habeas corpus petition, a court's review is "doubly deferential" because the court is charged with taking "a highly deferential look at counsel's performance through the deferential lens of § 2254(d)." Cullen v. Pinholster, 563 U.S. 170, 190 (2011) (citations and quotation marks omitted); see also Jackson v. Conway, 763 F.3d 115, 152-53 (2d Cir. 2014).

As stated above, Petitioner does not raise this aspect of his ineffective assistance of

23

### C.     Legal Sufficiency of the Evidence/Weight of the Evidence

#### 1.     Legal Sufficiency of the Evidence

Petitioner asserts that the evidence was legally insufficient to support his conviction. Petition ¶ 12 (Ground Four).  On direct appeal, the Appellate Division, Second Department held that Petitioner's "contention that the evidence was legally insufficient to support his convictions is unpreserved for appellate review, as defense counsel made only a general motion for a trial order of dismissal based upon the People's alleged failure to make out a prima facie case." Chance, 105 A.D.3d at 759.  In support of this determination, the Appellate Division cited to N.Y. Crim. Proc. Law § 470.05—New York's long-standing contemporaneous objection rule—and to People v. Hawkins, 11 N.Y.3d 484, 492 (2008), a New York State Court of Appeals case that stands for the proposition that in order to preserve a challenge to the sufficiency of the evidence for appellate review, a defendant must move for a "specifically directed" trial order of

---

counsel claim in the Petition but, as noted by the County Court judge, Petitioner's contention that video surveillance from the gas station existed was "entirely speculative" and, in any event, would not have helped to exculpate Petitioner on "the most serious charge."  Accordingly, it was not objectively unreasonable for trial counsel not to have spent time trying to find out whether such video surveillance existed.  An insufficient showing as to this prong of the Strickland test alone is fatal to Petitioner's claim.  See 466 U.S. at 697 ("[T]here is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order or even to address both components of the inquiry if the defendant makes an insufficient showing on one.").  Furthermore, under the "doubly deferential" standard of review applicable to the state court's denial of this claim, this Court does not find that this decision was contrary to, or an unreasonable application of, Strickland.

Consequently, I conclude, and respectfully recommend that Your Honor should conclude, that Petitioner's ineffective assistance of counsel claim—insofar as it is based on trial counsel's failure to apply to the court for investigative services to obtain a video tape from the gas station where the stolen credit card was used—should be denied.

24

dismissal. Id.[17] N.Y. Crim. Proc. Law § 470.05(2) is an independent and adequate state law ground for denial of a claim. See Downs v. Lape, 657 F.3d 97, 104 (2d Cir. 2011); Bowman v. Racette, No. 12 Civ. 4153, 2015 WL 1787130, at *30 (S.D.N.Y. Apr. 20, 2015). A state court's "invocation of the procedural bar [is] an independent and adequate state ground for denial of relief that prevents habeas relief." Hughes v. Phillips, 457 F. Supp. 2d 343, 369 (S.D.N.Y. 2006).

After finding that Petitioner's claim was unpreserved, the Appellate Division added, "In any event, viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt beyond a reasonable doubt." Chance, 105 A.D.3d at 759 (internal citation omitted). This alternative, merits-based determination, however, does not permit this Court to reach the merits of Petitioner's claim. Federal habeas review of a claim is precluded, even though a state has considered the merits of a claim, "as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision." Harris v. Reed, 489 U.S. 255, 264 n.10 (1989); see also Hughes, 457 F. Supp. 2d at 369 ("While alternatively reaching the lack of merit of the claims made '[i]n any event,' the Appellate Division's invocation of the procedural bar was an independent and adequate State ground for denial of relief that prevents habeas relief in the absence of demonstration of sufficient cause for that default and actual prejudice therefrom.") (citations omitted). Here, Petitioner has failed to allege, let alone establish, cause for this procedural default and prejudice arising therefrom, or

---

[17]The Appellate Division also cited to People v Flowers, 95 AD3d 1233 (2d Dep't 2012), a Second Department case that follows the holding in Hawkins.

that a fundamental miscarriage of justice will occur if this Court fails to consider this claim.  See Coleman, 501 U.S. at 750.

I therefore conclude, and respectfully recommend that Your Honor should conclude, that Petitioner's legal sufficiency of the evidence claim should be denied.[18]

### 2. <u>Weight of the Evidence</u>

Petitioner also seeks habeas relief on the ground that the verdict was against the weight of the evidence.  Petition ¶ 12 (Ground Four).  Such a claim is not cognizable on habeas review.  "A federal habeas court cannot address weight of the evidence claims because a challenge to a verdict based on the weight of the evidence is different from one based on the sufficiency of the evidence.  Specifically, the weight of the evidence argument is a pure state law claim whereas a legal sufficiency claim is based on federal due process principles."  Douglas v. Portuondo, 232 F. Supp. 2d 106, 116 (S.D.N.Y. 2002) (quotation marks, ellipsis, and citations omitted); see also Garbez v. Greiner, 01 Civ. 9865 (LAK)(GWG), 2002 WL 1760960, at *8 (S.D.N.Y. July 30, 2002).  Therefore, in making a "weight of the evidence" argument, Petitioner does not assert a federal claim as required by 28 U.S.C. § 2254(a).  I therefore conclude, and respectfully recommend that Your Honor should conclude, that Petitioner's weight of the evidence claim should be denied as unreviewable by a federal habeas court.  See Estelle v. McGuire, 502 U.S. 62, 68 (1991) ("In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

---

[18]Because I find that this claim should be denied as procedurally barred, I do not address Respondent's alternative arguments that it should be denied as unexhausted and/or meritless.

26

## CONCLUSION

For the foregoing reasons, I conclude, and respectfully recommend that Your Honor should conclude, that the Petition should be denied in its entirety.  As the Petition presents no questions of substance for appellate review, I conclude, and respectfully recommend, that a certificate of probable cause should not issue.  See Rodriguez v. Scully, 905 F.2d 24 (2d Cir. 1990) (per curiam); Alexander v. Harris, 595 F.2d 87, 90 91 (2d Cir. 1979).  I further conclude, and respectfully recommend, that the Court should certify pursuant to 28 U.S.C. § 1915(a) that an appeal from this order would not be taken in good faith.  See Coppedge v. United States, 369 U.S. 438 (1962).

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(1), as amended, and Fed. R. Civ. P. 72(b), the parties shall have fourteen (14) days, plus an additional three (3) days, pursuant to Fed. R. Civ. P. 6(d), or a total of seventeen (17) days, see Fed. R. Civ. P. 6(a), from the date hereof, to file written objections to the Report and Recommendation.  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of the Honorable Cathy Seibel, United States District Court, Southern District of New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the undersigned at the same address.

Failure to file timely objections to the Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.

Requests for extensions of time to file objections must be made to Judge Seibel.

Dated: March 12, 2018
      White Plains, New York

Respectfully submitted,

Lisa Margaret Smith
United States Magistrate Judge
Southern District of New York

A copy of this Report and Recommendation has been mailed to Petitioner